EDITH JORDAN,

    Plaintiff,

  v.

COUNTY OF CHEMUNG, CHRISTOPHER
J. MOSS, WILLIAM A. SCHROM, JOHN
DOE(S), and JANE DOE(S),

    Defendants.

**DECISION AND ORDER**

6:13-CV-06247 EAW

## INTRODUCTION

Plaintiff Edith Jordan ("Plaintiff") filed this action on May 14, 2013, complaining of violations of the First and Fourteenth Amendments, the Family Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL") and the New York Constitution. (Dkt. 1). The parties have completed discovery. (*See* Dkt. 49). Defendants County of Chemung, New York ("Chemung County" or "the County"), Christopher J. Moss ("Moss"), and William A. Schrom ("Schrom") (collectively, "Defendants") moved for summary judgment on August 1, 2016. (Dkt. 50). Plaintiff responded (Dkt. 55), and Defendants replied to Plaintiff's response. (Dkt. 59). Oral argument was held on January 20, 2017, at which time the Court reserved decision. (*See* Dkt. 64).

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

Plaintiff was employed by the Chemung County Sheriff's Office as a part-time Corrections Officer in the Chemung County Jail ("the Jail"), starting in August 2006. (Dkt. 50-18 at ¶¶ 1, 14; Dkt. 55-1 at 51; Dkt. 55-18 at ¶¶ 1, 14). At all relevant times, Moss was the Sheriff and Schrom was the Undersheriff of Chemung County. (Dkt. 50-18 at ¶¶ 3-4; Dkt. 50-3 at ¶ 1; Dkt. 51 at ¶ 1; Dkt. 55-18 at ¶¶ 3-4). Major John Hamula ("Hamula") was the superintendent of the Jail (Dkt. 50-18 at ¶ 9; Dkt. 55-18 at ¶ 9); Captain Charles Wilson ("Wilson") was responsible for Jail administration and operations (Dkt. 50-18 at ¶ 7; Dkt. 55-18 at ¶ 7); and Daniel Mandell ("Mandell"), a Lieutenant and then Captain, was Plaintiff's supervisor (Dkt. 50-18 at ¶ 8; Dkt. 55-18 at ¶ 8).

Plaintiff was initially hired to work only as needed, on a fill-in basis for other corrections officers, but was later given regular, prescheduled shifts on Tuesdays and Sundays. (*See* Dkt. 50-18 at ¶¶ 15-16; Dkt. 55-18 at ¶ 15-16; *see also* Dkt. 55-1 at 52). Plaintiff was a competent employee when she worked. (Dkt. 50-18 at ¶ 17; Dkt. 55-18 at ¶ 17). On or about June 18, 2010, Plaintiff submitted an FMLA request, seeking intermittent leave "to attend to her sick children and/or their personal needs." (Dkt. 50-18 at ¶ 21; Dkt. 55-18 at ¶ 21; *see, e.g.,* Dkt. 55-1 at 121). On June 28 or 29, 2010,

---

[1]    These facts are undisputed based upon the parties' Local Rule 56 statements of undisputed facts. (*See* Dkt. 50-18; Dkt. 55-18).

Plaintiff requested that Wilson remove her from her regularly scheduled Tuesday shift. (Dkt. 50-18 at ¶ 22; Dkt. 55-7 at 2; Dkt. 55-18 at ¶ 22). The County accepted and approved Plaintiff's FMLA request on June 30, 2010. (Dkt. 50-18 at ¶ 23; Dkt. 55-18 at ¶ 23).

Plaintiff last appeared for work on December 9, 2010. (Dkt. 50-18 at ¶ 27; Dkt. 55-18 at ¶ 27). Plaintiff submitted a claim for unemployment on August 30, 2010, which was opposed by the Chemung County Sheriff's Office. (Dkt. 50-18 at ¶ 30; *see* Dkt. 55-18 at ¶ 30). The County ultimately terminated Plaintiff's employment on September 28, 2011. (Dkt. 55-12 at 2).

## DISCUSSION

Plaintiff's 11 causes of action are: (1) violation of the FMLA by Chemung County; (2) violation of the Fourteenth Amendment's Due Process Clause by all Defendants; (3) gender discrimination under Title VII by Chemung County; (4) gender discrimination under the NYSHRL by Moss and Schrom; (5) violations of the Equal Protection Clause of the Fourteenth Amendment by all Defendants; (6) retaliation in violation of the First Amendment by all Defendants; (7) retaliation in violation of Title VII by Chemung County; (8) retaliation in violation of the NYSHRL by Moss and Schrom; (9) violation of the New York State Constitution, Article I § 11 by all Defendants; (10) violation of the New York State Constitution, Article I § 6 by all Defendants; and (11) violation of the New York State Constitution, Article I § 8 by all Defendants. (Dkt. 1). Defendants seek summary judgment on each cause of action. (*See* Dkt. 50-19).

The Court first addresses Plaintiff's FMLA claim, then proceeds to discuss her Due Process claim, Title VII claims, First Amendment claim, Equal Protection Clause claim, and, finally, her claims under the NYSHRL and the New York State Constitution.

## I.     Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    Plaintiff's FMLA Claim Survives Summary Judgment in Part

Plaintiff claims a violation of the FMLA against Chemung County. (Dkt. 1 at ¶¶ 20-24). The County argues that Plaintiff's FMLA claim fails as a matter of law. (Dkt. 50-19 at 4-8).

FMLA allows eligible employees up to a total of 12 weeks of unpaid leave during any 12-month period to allow an employee to care "for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). "[A]t the end of an employee's leave[,] the employee has the right to return to the position [s]he held before the leave or its equivalent. . . ." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (citing 29 U.S.C. § 2614).

A state employee may seek equitable relief or damages against a state employer if the employer interferes with, restrains, or denies the exercise of FMLA rights under § 2612(a)(1)(C). 29 U.S.C. § 2615(a)(1); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003). *But see Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 33 (2012) (disallowing money damages suits against states for violations of § 2612(a)(1)(D)).

> The regulations promulgated pursuant to the FMLA explain that "'[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave," 29 C.F.R. § 825.220(b), and that "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c).

*Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004).

> In a general sense, an employee brings an "interference" claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. "Retaliation" claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA.

*Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.2d 158, 166 (2d Cir. 2017) (citations omitted).

As a threshold matter, the Court notes that although the complaint fails to specify whether Plaintiff raises an interference and/or retaliation claim, it is properly read as raising both types of FMLA claims. Plaintiff alleges that Chemung County "intentionally and willfully interfered with and denied the exercise of rights provided under the FMLA by removing her from the work schedule, taking away all of her hours, and then discharging her." (Dkt. 1 at ¶ 23). And, although clearer pleading would have been preferable, the Court reads Plaintiff's complaint to assert that Chemung County removed Plaintiff's regularly scheduled Sunday shifts and then terminated her in retaliation for Plaintiff's exercise of FMLA rights. This is sufficient to plead an FMLA retaliation claim.

## A.     Plaintiff's FMLA Interference Claim Fails

> [T]o prevail on a claim of interference with [] FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

Here, the County does not dispute that Plaintiff was eligible for FMLA benefits, that it is an employer as defined by the FMLA, that Plaintiff was entitled to take leave under the FMLA, and that she gave notice to Wilson of her intent to take such leave. (*See* Dkt. 50-18 at ¶¶ 21-24). Plaintiff took leave to care for her son, pursuant to

§ 2612(a)(1)(C). (*See* Dkt. 55-1 at 121). However, the County argues that Plaintiff's interference claim fails because there is no evidence to show interference with Plaintiff's FMLA rights. (Dkt. 50-19 at 5-8).[2] The Court agrees.

Plaintiff admits in her papers that her "FMLA request was accepted and approved by [Chemung County] on June 30, 2010." (Dkt. 55-18 at ¶ 23). Plaintiff also admitted during her deposition that her FMLA leave request was approved. (Dkt. 55-1 at 147). Plaintiff was not denied intermittent leave between the time her leave request was approved and when she was removed from the Sunday and Tuesday work schedule. (*Id.* at 149-50). Plaintiff was removed from the Tuesday schedule when she requested to be removed. (Dkt. 55-2 at 1, 46). Thus, Plaintiff has failed to identify any denial of FMLA benefits, and her interference claim fails as a matter of law. *See Douyon v. N.Y.C. Dep't of Educ.*, 665 F. App'x 54, 57 (2d Cir. 2016) (affirming where "[the plaintiff] failed to adduce evidence . . . that the defendants denied her benefits to which she was entitled under the FMLA"); *Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 622 (2d Cir. 2012) (finding that the plaintiff failed to show FMLA interference where there was no evidence

---

[2]      The parties incorrectly apply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting test to Plaintiff's FMLA interference claim. (*See* Dkt. 50-19 at 6-8). In this Circuit, the burden-shifting test does not apply to interference claims; it applies only to retaliation claims. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) ("[T]his Court determined only that retaliation claims would be governed by *McDonnell Douglas* analysis."); *see also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424-31 (2d Cir. 2016) (applying the burden-shifting framework to a retaliation claim, but not to an interference claim); *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004) (discussing out-of-Circuit caselaw and finding "it would be appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation—where the employer's intent is material—but not to assertions of interference—where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right").

that the employer "refused to authorize any FMLA leave or discouraged [the plaintiff] from using such leave").

Plaintiff argues that she requested she be removed from her Tuesday shifts only, but that she was "penalized" for not working the Tuesday shift with the removal of her Sunday shift as well. (Dkt. 55-17 at 7-8). Plaintiff further argues that once she obtained child care in August 2010, presumably obviating her need for FMLA leave, she was not restored to her regularly scheduled Tuesday and Sunday shifts. (*Id.* at 8). These arguments sound in retaliation, not interference as Plaintiff suggests, because the violations were after she exercised her FMLA benefits. *Cf. Shultz v. Congregation Shearith Israel of N.Y.C.*, ___ F.3d ___, 2017 WL 3427130, at *6 (2d Cir. Aug. 10, 2017) (finding that an employee's termination "weeks *before* she was scheduled to commence" FMLA leave was unlawful interference (emphasis added)). In other words, according to Plaintiff's own allegations, she was not denied FMLA benefits, but rather she was penalized for exercising her FMLA rights.

## B. Plaintiff's FMLA Retaliation Claim Survives in Part

FMLA retaliation claims are analyzed under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting test. *Potenza*, 365 F.3d at 168; *Graziadio*, 817 F.3d at 429. To establish a *prima facie* case of FMLA retaliation, the plaintiff must show "that 1) [s]he exercised rights protected under the FMLA; 2) [s]he was qualified for h[er] position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an

inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (citing *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)).

"For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights." *Millea v. Metro-N. R.R. Co.*, 658 F3d 154, 164 (2d Cir. 2011); *see also id.* at 166 ("[W]e hold that the definition of 'materially adverse employment action' articulated by the Supreme Court in [*Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006)] applies to FMLA retaliation claims."). "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." *Id.* (quoting *Burlington N.*, 548 U.S. at 68). "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien v. Entergy Nuclear Operations*, 663 F.3d 556, 569 (2d Cir. 2011). "[T]here are no bright-line rules with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore courts must pore over each case to determine whether the challenged employment action reaches the level of adverse." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (internal quotation marks and citation omitted).

An inference of retaliatory intent "can be established when there is a basis for a jury to conclude that 'a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer.'" *Donnelly*, 691 F.3d at 152 (citation omitted). "The plaintiff's burden of proof at the *prima facie* stage 'is not onerous.'"

*Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted); *see, e.g.*, *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) ("[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is '*de minimis.*'" (citation omitted)). At the *prima facie* stage, temporal proximity between the exercise of FMLA benefits and an adverse employment action may give rise to a retaliatory inference, as will employer penalties for absences which were permitted by FMLA. *Donnelly*, 691 F.3d at 152; *see also Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 54 (2d Cir. 2017) (finding that temporal proximity between an adverse employment action and FMLA leave was sufficient to give rise to an inference of retaliatory intent); *Sista*, 445 F.3d at 176 (noting that retaliation can be shown where FMLA absences are a "negative factor" in a decision to fire an employee (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1126 (9th Cir. 2001))).

"If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). The plaintiff must "set forth evidence from which a factfinder could reasonably conclude that the legitimate and nondiscriminatory explanations given" by the defendant for the adverse employment action are pretextual. *Thomsen*, 483 F. App'x at 623. A mere scintilla of evidence is insufficient to establish pretext. *Alexander v. Bd. of Educ. of City of N.Y.*, 648 F. App'x 118, 122 (2d Cir. 2016) (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003)).

Conclusory assertions, unsupported by the record, are "plainly insufficient to survive summary judgment." *Thomsen*, 483 F. App'x at 623 (citing *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)). However, "[a] plaintiff may prove retaliation by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Alexander*, 648 F. App'x at 122 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

As described below, Plaintiff has established a genuine issue of material fact as to the County's alleged retaliatory elimination of Plaintiff's regularly scheduled Sunday shift, opposition to Plaintiff's unemployment benefits application, and refusal to reinstate regularly scheduled shifts. However, considering the evidence in the light most favorable to Plaintiff, no rational jury could find in her favor on her claim of retaliatory termination.

### 1. Plaintiff Has Established a *Prima Facie* Case

The County does not challenge that Plaintiff has satisfied the first two elements of a *prima facie* retaliation claim. (*See* Dkt. 59-1 at 9).

Plaintiff claims that Chemung County was motivated by retaliatory intent when it: (1) removed her prescheduled Sunday shift, even though she only requested FMLA leave for her Tuesday shifts; (2) opposed Plaintiff's application for unemployment benefits; (3) refused to restore Plaintiff's regularly scheduled shifts once she secured child care; and (4) terminated Plaintiff's employment. (Dkt. 55-17 at 7-11).

### a.   <u>Elimination of Plaintiff's Sunday Shift</u>

Plaintiff's removal from the Sunday shift constitutes an adverse employment action. Plaintiff filed for FMLA benefits on June 17, 2010. (Dkt. 55-10). In her filing, Plaintiff requested intermittent leave. (*Id.* at 2). Although the FMLA form asks the applicant to specify the requested schedule for intermittent leave, Plaintiff stated only that she "will have to take time off to attend to sick children and/or their personal needs pertaining to illness" (*id.*), and that the "[d]ay(s) will be intermittently [sic] depending on the need[s] of my child at that time." (*Id.* at 5).

Although Plaintiff's FMLA request failed to specify whether or not she intended to keep her regularly scheduled shifts (*see* Dkt. 55-1 at 130), on June 29, 2010, Plaintiff emailed Wilson to tell him that she would no longer be available to work her regularly scheduled Tuesday shift, but that she still intended to work the Sunday shift. (Dkt. 55-7 at 2). Plaintiff requested that Wilson "back fill" her Tuesday shift "for the remainder of 2010" and place Plaintiff on the call-in list. (*Id.*). Plaintiff did not request that she be taken off the Sunday schedule. (*See id.*). Indeed, Wilson confirmed by email on June 29, 2010, that Plaintiff needed to be removed from the Tuesday schedule, but not from the Sunday schedule. (Dkt. 55-13 at 2). The removal from the Sunday shift—which Plaintiff did not request—"significantly diminished" Plaintiff's material responsibilities, constituting half of her regularly scheduled hours each week. The unrequested removal of work hours is sufficient to dissuade a reasonable employee from exercising FMLA rights, especially where, as here, the employee is paid by the hour. As such, Plaintiff has established that her reduction in hours was an adverse employment action.

The record also includes sufficient evidence to satisfy Plaintiff's burden to show an inference that the removal of her Sunday shift was done in retaliation for her use of FMLA leave. Plaintiff was removed from the Sunday schedule as of July 27 or 28, 2010. (*See* Dkt. 55-4 at 2). The County alleges that the Sunday hours were taken away because the Sunday and Tuesday shifts "were part of a package deal." (*Id.*; *see, e.g.*, Dkt. 50-5 at ¶ 22). When Plaintiff requested to be removed from her Tuesday shift, she was also removed from the Sunday shift and placed on the call-in list. (Dkt. 55-2 at 1). Plaintiff testified that she did not understand that the shifts were a package deal, and that the shifts were given to her on separate occasions. (Dkt. 55-1 at 122-23). Viewing the evidence in the light most favorable to Plaintiff, the days were not originally scheduled as a package deal, and, as described in more detail below, there is little evidence of the shifts being linked. Plaintiff's Sunday shift was taken away after she requested FMLA leave for her Tuesday shift only. This sequence of events gives rise to an inference that the Sunday shift was removed in retaliation for Plaintiff's use of FMLA. Thus, Plaintiff has established a *prima facie* case of retaliation based on the removal of her Sunday shift.

### b.  The County's Opposition to Plaintiff's Application for Unemployment Benefits

Plaintiff has also established that the County's opposition to her application for unemployment was an adverse employment action. If considered on its own, the County's opposition to Plaintiff's application for unemployment benefits (*see* Dkt. 55-17 at 9), may not be an adverse employment action. *See, e.g.*, *Wright v. City of Syracuse*, No. 5:10-CV-0661 (GTS/TWD), 2014 WL 1293527, at *20 (N.D.N.Y. Mar. 31, 2014)

(stating that "an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim," and collecting cases); *Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 245 (N.D.N.Y. 1999) ("[The defendant's] opposition to [the] plaintiff's application for unemployment benefits . . . is not an adverse employment action.   This was a permissible, non-discriminatory legal position taken by [the defendant] in opposition to [the] plaintiff's application for such benefits.").   However, when viewed in light of Plaintiff's other allegations, *see Tepperwien*, 663 F.3d at 569, it would be reasonable for an employee in this situation to be dissuaded from filing an FMLA claim.   And, when considered in conjunction with the County's possibly retaliatory reduction of Plaintiff's work hours, Plaintiff has established an inference of retaliatory intent.   Thus, Plaintiff has established the *de minimis* showing required to carry her burden at this stage as to the County's opposition to her application for unemployment benefits.

c. **The County's Refusal to Restore Plaintiff to Regularly Scheduled Hours**

Similarly, Plaintiff has met her burden as to Chemung County's refusal to restore Plaintiff's regularly scheduled shifts after she secured childcare.   This refusal could constitute a materially adverse change in the terms or conditions of Plaintiff's employment.   When Plaintiff initially requested to be removed from the Tuesday shift, she explicitly asked to "back fill" her Tuesday shift "for the remainder of 2010."   (Dkt. 55-7 at 2).   She did not ask to back-fill her Sunday shift, as she never requested removal from the Sunday schedule.   After solving her childcare issue, Plaintiff requested that her

regularly scheduled shifts be restored on both July 25, 2010, and September 17, 2010. (Dkt. 55-8 at 2; Dkt. 55-11 at 2). Despite these requests, Plaintiff was not restored to either the Sunday or Tuesday shifts, but remained only on the call-in list. (Dkt. 55-16 at ¶ 15). Considered within the context of the other adverse employment actions, the County's refusal to reschedule Plaintiff's shifts could constitute an adverse employment action. And, as with the County's removal of Plaintiff's Sunday shift, there is a minimal inference that the refusal to reinstate Plaintiff's regularly scheduled shifts was in retaliation for Plaintiff's exercise of FMLA benefits.

### d. Plaintiff's Termination

Plaintiff's termination plainly constitutes an adverse action, *Mathirampuzha*, 548 F.3d at 78, but whether it gives rise to an inference of retaliation presents a closer question. Plaintiff asserts that an inference can be drawn because: (1) the termination occurred "about the time that the FMLA would have been over with" (Dkt. 55-2 at 58); and (2) she was "disciplined" for missing a Tuesday shift and failing to call the Jail after her FMLA leave was approved. (*See* Dkt. 55-16 at 4).

Plaintiff's first rationale is clearly lacking support in the record. Plaintiff's termination did not occur "about the time that the FMLA would have been over with." (*See* Dkt. 55-2 at 58). Plaintiff's request for FMLA intermittent leave was approved on June 30, 2010. (Dkt. 50-18 at ¶ 23; Dkt. 55-18 at ¶ 23). According to Chemung County's FMLA approval, Plaintiff's FMLA request expired on June 17, 2011. (Dkt. 50-15 at 22). Plaintiff was not terminated until September 28, 2011, more than three months later. (Dkt. 55-12 at 2). Even if some inference could be drawn because Plaintiff was

fired a few months after her FMLA leave expired, Plaintiff informed her supervisors that she no longer needed to use FMLA leave on July 25, 2010, and again on September 17, 2010. (Dkt. 55-8 at 2; Dkt. 55-11 at 2). The notification was sent more than a year before Plaintiff was terminated. Although Plaintiff's burden of showing an inference of retaliation is *de minimis*, *see Cronin*, 46 F.3d at 203-04, the timing of her termination fails to meet even that low burden. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding that to establish retaliation under Title VII, five months between the exercise of a federal right and an adverse employment action "*might* be enough to establish a prima facie case" (emphasis added)); *cf. Offor*, 2017 WL 253616, at *2 (finding that, at the pleading stage, allegations than an adverse employment event occurred within one month of exercising FMLA rights was sufficient to give rise to an inference of retaliatory intent). Plaintiff offers nothing else to support her claimed inference of discrimination—under the circumstances, the record simply does not support an inference even under the low threshold necessary to establish a *prima facie* case. The timing between Plaintiff's exercise of her FMLA rights and the termination of her employment is just too remote.

It is a closer question whether Plaintiff's argument that she was "disciplined" for using FMLA leave, allegedly leading to her termination, meets the *de minimis* requirement. (*See* Dkt. 55-17 at 10-11). The record before the Court includes a "Notice and Statement of Charges" dated "July 2010" relating to Plaintiff's "no call/no show" absence on Tuesday, July 6, 2010. (Dkt. 55-5). According to the Notice, Plaintiff "failed to make any notification regarding [her] absence to a member of the supervisory

staff. . . ." (*Id.* at 3). Plaintiff's scheduled shift on July 6, 2010, was Plaintiff's "second no call/no show absence and third unexcused absence" between March 2010 and July 2010. (*Id.* at 2).[3]

Plaintiff actually informed supervisory staff that she did not intend to appear for work on July 6, 2010, because she was using FMLA intermittent leave. By email dated June 29, 2010, Plaintiff informed Wilson (with a carbon copy to her shift supervisor) that "[e]ffective immediately . . . I will not be able to work B-Line on Tuesday" and requested that Wilson "back fill" her Tuesday shifts for the remainder of 2010. (Dkt. 55-7 at 2). Plaintiff requested removal from her Tuesday shift due to "family obligations" for which she had submitted an FMLA leave request. (*Id.*). Thus, despite notifying Wilson and her shift supervisory, Plaintiff was disciplined for not showing up for her shift on Tuesday, July 6, 2010.

Plaintiff's failure to show may have been cited as part of the reason that Plaintiff was later terminated. The documentation suggests the alleged no call/no show absence on July 6, 2010, was at least a small part of the County's calculus in terminating her. Plaintiff's termination letter points to "documentation starting back in July 2010 where there were 3 separate occasions that you either turned down, didn't return calls for work or agreed to work then cancelled the hours. . . ." (Dkt. 55-12 at 2). The termination letter also goes on to document 44 other opportunities that Plaintiff was offered hours but either refused or failed to respond. (*Id.*). The termination letter does not explicitly reference

---

[3] Although the Notice includes a sanction of "[t]ermination," Plaintiff was not actually terminated until more than a year later. (*See id.* at 3).

July 6, 2010 (*see id.*), but Wilson's February 11, 2011, memo to Schrom notes the three dates in July 2010—a July 1 absence, the July 6 no call/no show absence, and a July 28 failure to return a call offering hours. (Dkt. 50-15 at 44). The Court also notes that both the July 2010 "Notice and Statement of Charges" recommended termination due, in part, to the July 6, 2010 absence (Dkt. 55-5 at 3), and an email from Moss to Wilson on July 6, 2010, also recommended termination because of that absence.

Despite those contemporaneous recommendations that Plaintiff be terminated, she was not actually terminated until more than a year later. (*See* Dkt. 55-12 at 2). Nonetheless, Plaintiff has shown a *de minimus* inference of retaliatory intent, although the inference is only minimal given the length of time between the July 6, 2010, absence and the date of her termination, and the fact that she was provided numerous other opportunities to work in the interim of which she failed to take advantage.

### 2. The County Has Put Forth Legitimate, Non-Retaliatory Reasons for the Adverse Employment Actions

The County has put forth legitimate, non-discriminatory reasons for removing Plaintiff's Sunday shift, and for terminating Plaintiff. As to the removal of Plaintiff's regularly scheduled Sunday shift, the County claims that the Sunday and Tuesday shifts were provided as "a package[] deal—the two days came together." (Dkt. 50-5 at ¶ 22; *see, e.g.*, Dkt. 50-3 at ¶ 12). When Plaintiff requested to be removed from her Tuesday shift, she was also removed from the Sunday shift and placed on the call-in list. (Dkt. 50-5 at ¶ 23). Mandell testified that Plaintiff was placed on the call-in list "in an attempt to comply with her FMLA application and based upon her communication with Captain

Wilson wherein she stated that she could not work her regularly scheduled days." (*Id.* at ¶ 26; *see, e.g., id.* at ¶ 30). The County's reasons for removing Plaintiff from her regularly scheduled shifts are facially valid as non-retaliatory attempts to comply with Plaintiff's request.

The County also put forward legitimate reasons for opposing Plaintiff's application for unemployment benefits. Plaintiff was on the call-in list when she applied for unemployment, and she had been requesting shifts around the time that she applied for unemployment. (*See* Dkt. 50-19 at 75-79, 99) The County asserts that it opposed Plaintiff's unemployment benefits because it felt Plaintiff was still employed at the time that she applied. (*See* Dkt. 59-1 at 11). There is some support for this reasoning in the record. (*See* Dkt. 50-15 at 111 (showing Schrom's intention to oppose Plaintiff's application because she was still employed by the County)). Thus, the County has put forward a legitimate, non-retaliatory reason for opposing Plaintiff's application for unemployment benefits.

Similarly, the County also put forward legitimate reasons for not providing Plaintiff with the regularly scheduled shifts after she returned to work. As noted above, Plaintiff explicitly requested that her Tuesday shifts be filled by another officer for the rest of 2010. (Dkt. 55-7 at 2). Those shifts were filled by another officer, Allison Lambert. (Dkt. 50-9 at 12). This is a legitimate reason for not reinstating Plaintiff to her previously scheduled shifts.

Finally, the County put forth legitimate, non-retaliatory reasons for terminating Plaintiff's employment. Plaintiff had a history of unexcused absences and "an excessive

amount of sick time." (*See, e.g.*, Dkt. 50-15 at 12). Although Plaintiff's annual job performance evaluations for 2007, 2008, and 2010 are generally positive, her dependability was evaluated as either "improving" or "unsatisfactory." (*Id.* at 2-10). Her December 12, 2007, evaluation states that Plaintiff "needs to be more accessible." (*Id.* at 3). Plaintiff's October 9, 2008, evaluation notes Plaintiff "has an issue working her scheduled hours. She calls in sick and backs out of scheduled hours." (*Id.* at 6). Similarly, Plaintiff's September 7, 2010, evaluation states:

> [Plaintiff's] attendance over the past 12 months has been unsatisfactory. She has 12 occasions of sick time use in the past 12 months. She also on several occasions advised her supervisors that she was unable to work on days that she was scheduled and part of the daily minimum. She needs to show a tremendous improvement in dependability over the next 12 months.

(*Id.* at 9).

A memorandum authored by Mandell on March 25, 2010, notes that Plaintiff used sick time on sixteen days between January 2009 and March 2010. (*Id.* at 12). It also notes that Plaintiff failed to show for her shift without calling on March 25, 2010. (*Id.*). Plaintiff was counseled as to her use of sick time and unexcused absences on June 1, 2010. (*Id.* at 13). These absences occurred before Plaintiff applied for FMLA leave on June 18, 2010.

Plaintiff also consistently failed to respond to scheduling calls, even after she notified the County that she intended to return to her regularly scheduled shifts on July 25, 2010. (*See* Dkt. 55-8 at 2; *see also* Dkt. 55-11 at 2 (stating that Plaintiff had made arrangements for child care and could return to her regular Tuesday shift)). Plaintiff failed to return calls six times in August 2010, six times in September 2010, twice in

October 2010, 13 times in November 2010, and 14 times in December 2010. (*Id.* at 44-45; *see, e.g.*, Dkt. 50-8 at 28, 78; *see also* Dkt. 50-13 at 25 (Schrom testifying that "[f]rom July of 2010 to December of 2010 there were 47 occasions that [Plaintiff] was not available, chose not to come to work, [or] had hours scheduled and backed out. Then there was [sic] additional attempts to contact [Plaintiff] in 2011 that were unsuccessful")). Once in August 2010 and again in December 2010, Plaintiff accepted a call-in shift and then cancelled. (Dkt. 50-15 at 44-45). Plaintiff worked only eight shifts between August and December 2010. (*Id.*).

Plaintiff was informed by letter from Schrom dated September 28, 2011, that she had been terminated. (Dkt. 55-12). The termination letter notes that Plaintiff failed to respond to two messages from Hamula offering for Plaintiff "to return to work on pre-scheduled days." (*Id.* at 2). Hamula called both Plaintiff's home and cell phone numbers when leaving those messages. (*Id.*).

Plaintiff's documented dependability issues and failure to accept call-in shifts or return calls for shifts provides sufficient legitimate, non-retaliatory reasons for Plaintiff's termination to carry the County's burden at this stage.

### 3. Plaintiff Has Shown Issues of Material Fact as to the Removal of Hours, Refusal to Reinstate Hours, and Opposition to Unemployment Benefits

Having found that the County has put forward legitimate, non-retaliatory reasons for the adverse employment actions, the burden shifts back to Plaintiff to show that the stated reasons were pretextual. *See Graziadio*, 817 F.3d at 429. Plaintiff can meet this burden as to the removal of her Sunday hours, the County's opposition to Plaintiff's

unemployment benefits application, and refusal to reschedule her for regular hours. However, Plaintiff cannot establish pretext with respect to her termination.

### a.    The County's Removal of Plaintiff's Sunday Shift

The County fails to provide any documentary support for the assertion that Plaintiff's Sunday and Tuesday shifts were offered as a package deal, or that anyone understood the shifts were a package deal at the time they were offered. Mandell's affidavit does not cite to any documentation in making the assertion that the days came together. (*See* Dkt. 50-5 at ¶ 22). There is only Mandell's statement that Plaintiff could not work Sunday if she did not work Tuesday. Schrom's affidavit cites to Dkt. 50-15, without a pincite, in support of the assertion that the days were inseparable. (Dkt. 50-3 at ¶ 12). The 133-page exhibit at Dkt. 50-15 fails to provide *any* support that, as of the time that the days were offered in December 2009, Plaintiff needed to work both Sunday and Tuesday. (*See* Dkt. 50-15). Additionally, Wilson's email from June 29, 2010, states that Plaintiff removed herself from the Tuesday shift, but "she is still pre-scheduled to work Sunday's [sic] through the end of 2010." (Dkt. 55-14 at 2). This undercuts the suggestion that if Plaintiff gave up her Tuesday shift, the Sunday shift had to be removed as well.

The only evidence that Plaintiff's scheduled shifts were inseparable is in a February 10, 2011, memorandum, authored by Mandell. (*See* Dkt. 50-15 at 44). That memorandum was written years after Plaintiff was offered the shifts, and months after Plaintiff's Sunday hours were eliminated in response to her FMLA request to be taken off of the Tuesday shift only. The County has failed to show that there is no issue of

material fact as to whether Plaintiff's Sunday hours were eliminated in retaliation for her use of FMLA. As such, summary judgment is not appropriate on this part of Plaintiff's retaliation claim. *See, e.g., Alexander*, 648 F. App'x at 122 (allowing a plaintiff to "prove retaliation by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action").

    **b.**    <u>The County's Opposition to Plaintiff's Unemployment Benefits Application</u>

Summary judgment is also inappropriate with respect to Plaintiff's claim that the County's opposition to her unemployment benefits was retaliatory. Plaintiff asserts that the County's stance before the unemployment board shows that their legitimate reasons were pretextual because they opposed benefits on the grounds that Plaintiff voluntarily separated from her job. (Dkt. 55-17 at 9-10).

The County argues that the unemployment benefits were opposed because Plaintiff continued to work for the County. (Dkt. 59-1 at 11; *see also* Dkt. 50-15 at 111). However, in their submissions to the unemployment board, it is clear that the benefits were opposed because Plaintiff was not responding to the offers of call-in hours. (*See* Dkt 50-15 at 58). In opposing Plaintiff's application, the County argued that Plaintiff "should be disqualified from receiving benefits because [she] voluntarily separated from employment without good cause. . ." (Dkt. 50-15 at 126), and because she "was not available for employment. . . ." (*Id.* at 130). The evidence offered by Plaintiff suggests otherwise, as she repeatedly requested shifts and to be returned to normally scheduled

hours. (*See id.* at 75-79, 82-87). The County also continually offered her shifts (*see id.* at 44-45), suggesting, at a minimum, that it knew she was both available for work, and had not separated from employment. There is a clear issue of material fact as to the County's true intentions in opposing Plaintiff's application for unemployment benefits. The issue must be determined by a jury.

     **c.**     **The County's Refusal to Reinstate Plaintiff to Regularly Scheduled Hours**

Similarly, summary judgment is inappropriate on Plaintiff's claims of retaliation in refusing to reinstate regularly scheduled shifts. Following the end of her FMLA leave, Plaintiff asked to be given scheduled hours. (Dkt. 50-15 at 75). Thereafter, Plaintiff repeatedly requested that the County provide her with hours. (*See id.* at 76-79, 82-87). The County never provided Plaintiff with regularly scheduled shifts; she was left on the on-call list. Although there is some information in the record suggesting that Plaintiff's prior shifts had been filled by another officer (Dkt. 50-9 at 12), the County has not met its burden of showing its entitlement to summary judgment. The record does not show that the County attempted to provide or offered any other regularly scheduled shifts to Plaintiff after her FMLA leave ended. Nor does anything in the record state that the Tuesday and Sunday shifts were completely full, such that there was no room for Plaintiff to work those shifts as she had before she took FMLA leave. Thus, the County has not met its burden to show that summary judgment is appropriate on this portion of Plaintiff's claim.

### d.    **Plaintiff's Termination**

Finally, summary judgment is appropriate on Plaintiff's claim of retaliatory termination. Plaintiff puts forward no direct evidence that her use of FMLA leave was the reason she was fired, and the circumstantial evidence fails to suggest that a rational finder of fact could conclude that Plaintiff's termination was in retaliation for her use of FMLA benefits. In support of her arguments otherwise, Plaintiff asserts that she was ready and willing to return to her Sunday and Tuesday shift work as of August 2010, but, despite her willingness to return to work, she was never added to the schedule. (Dkt. 55-17 at 10-11 (citing Dkt. 55-8 at 2)). Plaintiff further claims that she attempted to meet with Hamula to get her regularly scheduled shifts restored, but that Hamula did not show up for the meeting. (*Id.*). Plaintiff fails to offer any *evidence* that Hamula's absence from the meeting had anything to do with Plaintiff's FMLA leave. Plaintiff's conclusory allegations are mere conjecture, unsupported by fact.

Plaintiff also argues that she "called back every time she received a call for shifts." (Dkt. 55-17 at 19). This argument lacks support in the record. The County puts forward evidence suggesting that Plaintiff failed to call back on a number of occasions. (*See* Dkt. 50-15 at 44-45). Additionally, Plaintiff admitted during her deposition that she had trouble with receiving calls on her home and cell phones. (Dkt. 55-2 at 2-3; *see also* Dkt. 50-8 at 8 (email from Lieutenant Terry Lockner ("Lockner") to Plaintiff on December 15, 2010, to which Plaintiff responded, stating that Lockner attempted to call Plaintiff for a shift but her voicemail "mailbox was full and not accepting any messages")).

And although Plaintiff was improperly disciplined for not showing up or calling on Tuesday, July 6, 2010, this single instance of potential retaliatory conduct is insufficient to establish a genuine issue of material fact. The "discipline" provides a *de minimis* inference of retaliatory intent, but nothing more. Plaintiff offers no further evidence of retaliatory intent. Plaintiff's evidence that her termination was in retaliation for her use of FMLA benefits meets the low bar to establish a *prima facie* case, but that evidence is wholly insufficient to show pretext. *See Caldarola v. Calabrese*, 298 F.3d at 156 (requiring the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts. . . ."). As such, summary judgment is appropriate regarding Plaintiff's claim of retaliatory termination.

## III.    Plaintiff's Due Process Claim Must be Dismissed

Defendants argue that Plaintiff's due process claim fails as a matter of law. (Dkt. 50-19 at 8-11). Specifically, Defendants argue that a collective bargaining agreement ("CBA") provided sufficient due process such that no pre-deprivation notice or hearing was required. (*Id.*).

The Due Process Clause was "'intended to secure the individual from the arbitrary exercise of the powers of government' . . . [and] serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (citations omitted). To succeed on a due process claim, a plaintiff must establish that "he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994). Where a state employee has a property right in her continued

employment under state law, that property right is protected by the Due Process Clause. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985).

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" *Id.* at 541 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation . . . be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 542. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended." *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 254 (2d Cir. 1995).

In determining the sufficiency of a hearing, courts address:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see, e.g., Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

"A predeprivation hearing has been required when 'the deprivation of property was pursuant to some established state procedure and "process" could be offered before any actual deprivation took place to serve as a check on the possibility that a wrongful

deprivation would occur.'" *Burtnieks v. City of N.Y.*, 716 F.2d 982, 987 (2d Cir. 1983) (citation omitted). Generally, states are required to provide tenured employees a hearing before termination. *Dwyer v. Regan*, 777 F.2d 825, 831 (2d Cir. 1986) (internal citation omitted); *see also Gilbert v. Homar*, 520 U.S. 924, 929 (1997) ("[P]retermination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." (citing *Loudermill*, 470 U.S. at 546)); *Interboro Inst., Inc. v. Foley*, 985 F.2d 90, 92 (2d Cir. 1993) ("The purpose of a pre-deprivation hearing is to ensure that decision-makers have before them the claimant's legal arguments and do not act on a one-sided or otherwise incomplete factual presentation.").

However, where a collective bargaining agreement provides for post-deprivation grievance and arbitration procedures to a challenged employment decision, such procedures are constitutionally adequate to satisfy due process. *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) (citing *Narumanchi v. Bd. of Tr. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988); *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002)). "There is no due process violation where pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Coolick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012).

Here, Plaintiff was a tenured employee at the time of her termination. (*See* Dkt. 50-13 at 57-58). Plaintiff was covered by the CBA in place at the time of her termination. (*See* Dkt. 50-13 at 58; *see, e.g.*, Dkt. 50-14 at 2-25 (showing the CBA which

was in effect from January 1, 2011 until December 31, 2012)). The CBA requires "notice of [any] disciplinary decision" be served in writing on the employee, and that the notice include "[t]he specific act(s) alleged that warrant disciplinary action and the specific sanction(s) [to be imposed]." (Dkt. 50-14 at 22). The employee may object in writing by filing a grievance within 10 days of the notice of discipline. (*Id.*). An arbitrator will make a final and binding decision on the discipline if the employee objects. (*Id.*).

Plaintiff was provided notice of her termination by letter dated September 28, 2011, (Dkt. 55-12 at 2), but she was not provided an opportunity to respond prior to being terminated. (*See* Dkt. 50-8 at 2; Dkt. 55-12 at 2). The termination notice letter did not provide Plaintiff with notice that she could object. (*See* Dkt. 55-12 at 2).

In opposing summary judgment, Plaintiff argues only that she was entitled to a pre-deprivation hearing. (Dkt. 55-17 at 15). Plaintiff makes no argument regarding the adequacy of the notice. Instead, Plaintiff argues that due process required a pre-deprivation hearing. Plaintiff relies almost exclusively on New York state trial-level court and out-of-circuit precedent in making out her federal due process argument. (*See* Dkt. 55-17 at 12-15). Plaintiff's argument is contradicted by clear Second Circuit precedent. *See Coolick*, 699 F.3d at 220; *Harhay*, 323 F.3d at 213.

Additionally, Plaintiff's reliance on *Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002), is misplaced. In that case, the defendant argued that—through a collective bargaining agreement negotiated by the plaintiff's union—the plaintiff had waived his right to pre-termination notice and an opportunity to be heard because the agreement failed to include such procedural measures. The *Ciambriello* court noted that

the existence of a collective bargaining agreement is not dispositive on the due process issue; such an agreement may fail to include all of the requirements of due process. *Id.* at 321 n.6 ("The fact that collective bargaining agreements might, in some circumstances, provide all the process that the union members are due obviously does not compel the conclusion that the CBA at issue here provided all the process that [the plaintiff] was due."). However, the Second Circuit in *Coolick*—which was decided after *Ciambriello*— stated that due process requires only pre-termination *notice* if a collective bargaining agreement is in place and provides for post-termination grievances. *See Coolick*, 699 F.3d at 220. Here, the CBA provides for both pre-termination notice, and for the submission of post-termination grievances. (Dkt. 50-14 at 22-23). A grieved employee is also permitted to appeal an unfavorable grievance decision by a supervisor or agency head "to independent arbitration. . . ." (*Id.* at 23). Under *Coolick*, the CBA is sufficient to comply with constitutional due process requirements.

The Court also notes that Plaintiff failed to file a timely grievance following her termination. The CBA requires that any grievance be filed within 10 days of the disciplinary action. (Dkt. 50-14 at 23). Plaintiff was terminated on September 28, 2011. (Dkt. 55-12 at 2). Her grievance was not filed until January 26, 2012. (*See* Dkt. 50-17 at 103). Defendants denied the grievance because it "far exceed[ed] the timeline outlined within the [CBA]." (Dkt. 50-17 at 103). No information in the record suggests that Plaintiff appealed the denial of her grievance.

Defendants have submitted a properly supported motion for summary judgment, and Plaintiff has failed to submit sufficient information to create a genuine issue for trial.

The undisputed facts establish that Defendants provided sufficient post-deprivation remedies through the CBA. Plaintiff failed to take advantage of these remedies in a timely manner. As such, summary judgment on Plaintiff's due process claim is appropriate.

## IV. Plaintiff's Title VII Claims

### A. Plaintiff Fails to Establish a *Prima Facie* Case of Gender Discrimination

Plaintiff's gender discrimination claim against the County fails as a matter of law. The County correctly asserts that Plaintiff has failed to establish a *prima facie* case, and, even if such a case has been established, Plaintiff has failed to show that the County's rationales were pretextual. (Dkt. 50-19 at 11-15).

"At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas* . . . , and its progeny." *Mathirampuzha*, 548 F.3d at 78. To establish a *prima facie* Title VII case, "the plaintiff bears the burden of establishing . . . that: '1) [she] belonged to a protected class; 2) [she] was qualified for the position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Id.* (citation omitted). As is noted above, the "plaintiff's burden of proof at the *prima facie* stage 'is not onerous.'" *Id.* (citation omitted); *see, e.g., Cronin*, 46 F.3d at 203-04.

1. **Adverse Employment Actions**

Here, it is undisputed that Plaintiff has established the first two prongs of a *prima facie* case. (*See* Dkt. 50-19 at 12-13). She is a female, which is a protected class. *See Sweeney v. Research Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983). Plaintiff was also qualified for her position.

Plaintiff argues that she suffered the following adverse employment actions: the removal of her Sunday shift; termination; the denial of training opportunities and promotion; and not being allowed to leave her station after having a foreign substance thrown on her by an inmate. (Dkt. 55-17 at 16-17)

As noted above, the removal of Plaintiff's shifts, and her termination were adverse employment actions. To the extent that Plaintiff alleges she was denied training opportunities and promotion, such events qualify as adverse employment actions. *See Moskowitz v. Coscette*, 3 F. App'x 1, 5 (2d Cir. 2001) (including as adverse employment actions "discharge, refusal to hire, *refusal to promote*, demotion, reduction in pay, and reprimand" (emphasis added) (citation omitted)); *Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (providing that the denial of training opportunities can constitute an adverse employment action where the plaintiff can "demonstrate that the employer offered training to other employees and that the plaintiff was denied training under circumstances giving rise to an inference of discrimination").

Plaintiff provides no caselaw which supports her assertion that the alleged failure to relieve Plaintiff from her station on a single occasion is an adverse employment action under Title VII. (*See* Dkt. 55-17 at 17-19). At least for purposes of a discrimination

claim (versus a retaliation claim), an adverse employment action must involve a materially adverse change in the terms or conditions of employment. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). No change in the terms of Plaintiff's employment happened when she was temporarily disallowed from taking a break. This was an isolated incident, which was not connected in any way with a loss of benefits or material responsibility. A rational fact-finder, viewing the proffered evidence objectively, could not conclude that the delay in providing Plaintiff relief from her station effectuated a materially adverse change in her employment. Thus, this incident fails to rise to the level of an adverse employment action. *See, e.g., Fox v. Costco Wholesale Corp.*, __ F. Supp. 3d __, 2017 WL 888324, at *12 (E.D.N.Y. Mar. 6, 2017) (finding that the employer's denial of two requests for breaks were insufficient to establish an adverse employment action). However, even if the Court assumes *arguendo* that this incident did constitute an adverse employment action, Plaintiff has not met her burden under *McDonnell Douglas* in showing an inference of discriminatory motivation sufficient to establish a *prima facie* case.

### 2. Plaintiff Fails to Show an Inference of Gender Discrimination

In contrast to her claims under the FMLA, Plaintiff fails to provide *any* evidence beyond her own conclusory allegations that Defendants were motivated by unlawful gender animus in removing Plaintiff's Sunday shift, refusing her training opportunities and promotion, refusing to permit her to leave her station on one occasion, or terminating her employment.

Plaintiff fails to even describe in her papers the basis for an inference of gender discrimination with respect to the removal of Plaintiff's Sunday shift or her termination. (*See* Dkt. 55-17 at 16-19). Having reviewed the entire record, the Court sees no evidence from which to make such an inference.

As to her training and promotion claims, Plaintiff alleges that male officers who started working at the same time that she did were given access to training and promoted to full-time positions which she and other female officers were not. (*Id.* at 17). Plaintiff was provided some training. (*See* Dkt. 50-15 at 38-39; Dkt. 55-1 at 52-54, 62-63). Plaintiff testified that there were other training opportunities that she was refused. (Dkt. 55-1 at 62, 64). For both the training/promotion claims and Plaintiff's claims as to the refusal to allow her to leave her post after being "thrown on," Plaintiff provides only her own conclusory testimony. (*See* Dkt. 55-16). Plaintiff offers no evidence or specifics to back up her claims, and there is no corroboration of any of these allegations in the record. At the summary judgment stage, a plaintiff cannot establish a *prima facie* case on the basis of conclusory allegations alone. *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985) ("[C]onclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)."); *see, e.g., id.* ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *see also id.* at 996 ("[T]he general principle [derived from the elements of proof in an employment discrimination case is] that a Title VII plaintiff must carry the initial burden of offering evidence adequate to 'raise an inference of discrimination.'" (citation omitted)). The record lacks

even a shred of evidence from which an inference can be drawn that Plaintiff was denied training opportunities and/or promotion *because she was a woman*. The same can be said of her failure to relieve claim. Therefore, summary judgment on Plaintiff's Title VII discrimination claim is appropriate.

## B.     Plaintiff's Title VII Retaliation Claim

The County argues that it is entitled to summary judgment on Plaintiff's Title VII retaliation claim as well. (Dkt. 50-19 at 22).

"Title VII's antiretaliation provision prohibits an employer from discriminating against an employee for opposing any practice made unlawful by Title VII." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2012); *see, e.g.*, *Deravin v. Kerik*, 335 F.3d 195, 203 (2d Cir. 2003). Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

> To establish a *prima facie* case of unlawful retaliation under Title VII, "an employee must show that (1) [s]he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action."

*Rivera*, 743 F.3d at 24 (citation omitted). There are two types of Title VII retaliation. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015).

> The opposition clause makes it unlawful for an employer to retaliate against an individual because she "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII.

*Id.* (citation omitted).

"Once the employee has established a *prima facie* case, the employer 'must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the [employee] to demonstrate pretext.'" *Verga v. Emergency Ambulance Serv.*, No. 12-CV-1199 (DRH)(ARL), 2014 WL 6473515, at *3 (E.D.N.Y. Nov. 18, 2014) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001)).

Here, Plaintiff has failed to establish a *prima facie* case, as she cannot point to any Title VII-protected activity for which she was retaliated against. Plaintiff has not presented any evidence that she opposed any practice by Defendants which was made unlawful by Title VII. (*See* Dkt. 55-17 at 8-11). Similarly, there is no evidence that Plaintiff participated in an EEOC proceeding for which she suffered retaliation. Indeed, Plaintiff's EEOC charge was not filed until February 29, 2012, more than five months after her termination. (Dkt. 50-7 at 2).[4] Plaintiff has not established the first prong of a *prima facie* retaliation claim, and, therefore, summary judgment is appropriate.

## V.   Plaintiff's First Amendment Retaliation Claim Survives Summary Judgment in Part

Defendants next argue that Plaintiff's First Amendment retaliation claim fails as a matter of law. (Dkt. 50-19 at 19-21). On summary judgment, a public employee asserting a First Amendment retaliation claim:

> must initially demonstrate by a preponderance of the evidence that: (1) [her] speech was constitutionally protected, (2) [s]he suffered an

---

[4]    At oral argument, Plaintiff's counsel mentioned that Plaintiff filed an EEOC charge "near the end of 2010." (*See* Dkt. 64). The record does not include any evidence of such a charge.

adverse employment decision, and (3) a causal connection exists between [her] speech and the adverse employment determination against [her], so that it can be said that [her] speech was a motivating factor in the determination.

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 553 (2d Cir. 2001) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). "Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251-52 (2d Cir. 2006) (internal quotation marks and citation omitted); *see, e.g., Gorman-Bakos*, 252 F.3d at 553 ("If a plaintiff establishes the[] three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct.").

"Whether speech addresses a matter of public concern is a question of law to be determined by the content, form, and context of a given statement, as revealed by the whole record." *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005) (internal quotation marks and citation omitted). "[I]f the basis for a First Amendment retaliation claim is a lawsuit, the subject of the lawsuit must touch upon a public concern." *Id.* "Gender discrimination in employment is without doubt a matter of public concern." *Id.* at 125; *see, e.g., Cotarelo*, 460 F.3d at 252 ("[D]iscrimination in a government workplace is a matter of public concern.").

A causal connection can be established by "showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos*, 252 F.3d at 554 (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

Plaintiff points to her filing of another discrimination suit as her protected speech. (Dkt. 55-17 at 22). The other suit was brought against Corning Community College ("CCC"), where Plaintiff had been a student at the Southern Tier Law Enforcement Academy. (*See* Dkt. 55-13 (showing U.S. District Judge Michael A. Telesca's Decision and Order in *Jordan v. Corning Cmty. Coll.*, No. 11-CV-6182, 2011 WL 4402752 (W.D.N.Y. Sept. 22, 2011)); *see also* Dkt. 55-1 at 21-22). No officer ever made any comments to Plaintiff about the suit. (Dkt. 55-2 at 43-44). However, Plaintiff believes that she was treated differently by Moss, Schrom, and Wilson because they knew about the suit. (*Id.* at 43-44). Chemung County Sheriff's Department Correctional Officer Michael Corsi ("Corsi") testified that there was general knowledge of Plaintiff's suit against CCC, but did not recall any particular person talking about the suit. (Dkt. 55-3 at 17-19).

Plaintiff's complaint against CCC about gender discrimination in a public setting was clearly a matter of public concern. *See Konits*, 394 F.3d at 125. Plaintiff asserts that she suffered two adverse employment actions which relate to her case against CCC. First, Plaintiff claims that she was not provided any opportunities to work on a call-in basis after she filed the suit. (Dkt. 55-17 at 23). This constitutes a materially adverse change in the terms of Plaintiff's employment, and, therefore, is an adverse employment

action. Second, Plaintiff was terminated. (*Id.*). As described above, termination is an adverse employment action.

Plaintiff asserts that there is a temporal connection between the adverse employment actions and developments in her suit against CCC. Plaintiff filed the suit against CCC on November 22, 2010. (*See* Dkt. 55-17 at 23); *see also Jordan v. Corning Cmty. Coll. et al.*, 6:11-CV-06182-EAW-MWP, Dkt. 1 (W.D.N.Y. Nov. 22, 2010). Defendants last called Plaintiff for a call-in shift thirty-seven days later, on December 29, 2010. (*See* Dkt. 55-4 at 3). Plaintiff's filing of the case against CCC and Defendants' cessation of offering her call-in shifts are sufficiently close in time such that Plaintiff has established causation through temporarily proximity. *See, e.g.*, *Gorman-Bakos*, 252 F.3d at 555 (finding "the passage of time [of two or three months] was brief enough to support an inference of a causal connection between the free speech and the alleged retaliatory actions").

Additionally, Plaintiff claims that her termination was related to First Amendment protected activity. The court denied the CCC defendants' motion to dismiss on September 22, 2011. *Jordan v. Corning Cmty. Coll.*, No. 11-CV-6182, 2011 WL 4402752 (W.D.N.Y. Sept. 22, 2011). Plaintiff was terminated six days later, on September 28, 2011. (Dkt. 55-12 at 2). However, unlike with Plaintiff's filing of the complaint, the "speech" Plaintiff claims was the basis for the retaliation was not her speech—it was the court's Decision and Order. Plaintiff fails to cite to a single case which suggests that the court's "speech" can be imputed to Plaintiff, and the Court finds none. Plaintiff does not argue that she was retaliated against because she opposed the

CCC defendants' motion to dismiss. Nor does she present any evidence that Defendants were aware of the court's decision or that they were monitoring developments in the case. She merely argues that her "termination was dated a mere six days following the District Court's denial of Corning Community College's motion to dismiss Plaintiff's lawsuit." (Dkt. 55-17 at 23). Because Plaintiff fails to assert that any of *her own* constitutionally protected speech was related to the termination, she cannot maintain a First Amendment retaliation claim in reference to her termination.

Defendants fail to make any argument suggesting that they would have stopped offering Plaintiff call-in shifts even absent her filing of the complaint. (*See* Dkt. 50-19 at 21; Dkt. 59-1 at 24). The Court finds no basis for such a finding in the record. As such, Defendants have not satisfied their burden in showing their entitlement to summary judgment. *See Cotarelo*, 460 F.3d at 251-52; *Gorman-Bakos*, 252 F.3d at 553. Thus, summary judgment is denied as to Plaintiff's First Amendment retaliation claim based on Defendants' cessation of offering her call-in shifts around the time she filed her complaint against CCC. However, because Plaintiff has not put forward any evidence of a causal connection between her own protected speech and her termination, summary judgment is granted on her First Amendment retaliation claim in reference to her termination.

**VI.** **Plaintiff's Equal Protection Claim Must Be Dismissed**

Defendants argue that Plaintiff has failed to put forward sufficient evidence to sustain an Equal Protection claim under 42 U.S.C. § 1983. (Dkt. 50-19 at 17-19).

"The substantive standards applicable to claims of employment discrimination under Title VII, [] are also generally applicable to claims of employment discrimination brought under . . . the Equal Protection Clause." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

The Court has dismissed Plaintiff's Title VII discrimination claim because Plaintiff fails to provide any evidence of unlawful gender animus. Plaintiff's Equal Protection claim is analytically identical. Thus, summary judgment is equally appropriate on Plaintiff's Equal Protection claim. *See, e.g.*, *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation . . . the Equal Protection Clause, and the factors justifying summary judgment dismissing [the plaintiff's] Title VII claim . . . equally support the summary dismissal of his claims for termination brought under 42 U.S.C. § . . . 1983.").

## VII.    Plaintiff's State Law Claims

### A.    Lack of Notice under N.Y. Mun. Law § 50-e

Defendants argue that Plaintiff's NYSHRL and New York constitutional claims fail because Plaintiff never filed a notice of claim as required under state law. (*See* Dkt. 50-19). Plaintiff seemingly concedes that no notice of claim was ever filed, (*see* Dkt. 55-17), and the record does not include any notice of claim.

Plaintiff contends that because she alleges NYSHRL violations against only Moss and Schrom, not Chemung County, no notice was required. (Dkt. 55-17 at 19-21).

N.Y. County Law requires that:

> [a]ny claim or notice of claim against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature, and whether casual or continuing trespass or nuisance and any other claim for damages arising at law or in equity, alleged to have been caused or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law.

N.Y. County Law § 52(1). N.Y. General Municipal Law § 50-e, in turn, requires:

> [i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

N.Y. Gen. Mun. Law § 50-e(1)(a); *see, e.g., Mills v. Cty. of Monroe*, 59 N.Y.2d 307, 311-12 (1983) (dismissing the plaintiff's NYSHRL claim for failure to file a notice of claim pursuant to N.Y. County Law § 52), *overruled, in part, on other grounds by Felder v. Casey*, 487 U.S. 131, 134 (1988).

A cause of action under the NYSHRL is subject to the notice requirements of N.Y. County Law § 52. *Picciano v. Nassau Cty. Civil Serv. Comm'n*, 736 N.Y.S.2d 55 (2d Dep't 2001); *see, e.g., Lewis v. Livingston Cty. Ctr. for Nursing & Rehab.*, 30 F. Supp. 3d 196, 207-08 (W.D.N.Y. 2014); *Grasso v. Schenectady Cty. Pub. Library*, 817 N.Y.S.2d 186 (3d Dep't 2006). The same is true for claims under the New York State constitution. *423 S. Salina St., Inc. v. City of Syracuse*, 68 N.Y.2d 474, 489 n.5 (1986). "Notice of claim requirements are construed strictly by New York state courts, and failure to abide

by their terms mandates dismissal of the action." *Lewis*, 30 F. Supp. 3d at 208 (internal citation omitted).[5]

Plaintiff argues that the notice requirement is limited to claims against the County government alone, not employees of the County, like Moss and Schrom. (Dkt. 55-17 at 21). Plaintiff was required to serve a notice of claim on Chemung County under § 52. Her failure to do so is fatal to all of her state law claims, including her state constitutional claims, against the County. *See, e.g.*, *Alexander v. City of N.Y.*, No. 02 Civ. 3555(TPG), 2004 WL 1907432, at *22 (S.D.N.Y. Aug. 25, 2004) ("[T]he New York notice of claim requirement applies both to common law causes of action, and to actions founded upon violations of state constitutional provisions. Failure to comply with the notice of claim requirement mandates dismissal of the action with prejudice." (citation omitted)).

Additionally, courts have routinely applied the notice requirement to claims against county employees. *See Bielski v. Green*, 674 F. Supp. 2d 414, 428 (W.D.N.Y. 2009) (applying the requirement to a claim brought against a county district attorney); *Keating v. Gaffney*, 182 F. Supp. 2d 278, 290 (E.D.N.Y. 2001) (dismissing NYSHRL claims against a county executive and other county employees because notice was not served within 90 days); *Pustilnik v. Hynes*, No. 99–CV–4087, 2000 WL 914629, at *7 (E.D.N.Y. June 27, 2000) (dismissing NYSHRL claims against a district attorney and

---

[5]     Late notice is allowed if a claim is brought "to vindicate the public interest," or such leave is granted by a court. *Mills v. Cty. of Monroe*, 59 N.Y.2d 307, 311 (1983); *see also* N.Y. Gen. Mun. Law 50-e(5) (requiring a court contemplating allowing late notice to "consider, in particular, whether the public corporation or its attorney or its insurance carrier acquired actual knowledge of the essential facts constituting the claim within the time specified in [§ 50-e(1)] or within a reasonable time thereafter," and all other relevant facts and circumstances).

another county employee because "[c]ounty officials [are] subject to the notice of claim provision under [§ 52]"). However, "service of a notice of claim upon a public corporation is not a condition precedent to the commencement of an action against 'an officer, appointee or employee of [the] public corporation' unless 'the corporation has a statutory obligation to indemnify such person' under the General Municipal Law 'or any other provision of law.'" *Villar v. Howard*, 28 N.Y.3d 74, 78 (2016) (quoting N.Y. Gen. Mun. Law § 50-e(1)(b)). Chemung County is required by law to indemnify Schrom. *See* N.Y. Pub. Off. Law § 18 (requiring a county to "provide for the defense of the employee in any civil action or proceeding, state or federal, arising out of any alleged act or omission which occurred or allegedly occurred while the employee was acting within the scope of his public employment or duties," and defining "employee" as "any . . . person holding a position by election, appointment or employment in the service of a public entity, whether or not compensated, but shall not include the sheriff of any county. . . ."). As such, notice was required for the claims against Schrom.

Plaintiff argues that *Lee v. City of Syracuse*, 603 F. Supp. 2d 417 (N.D.N.Y. 2009), *abrogated on other grounds by Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471 (2d Cir. 2014), supports her claim that § 50-e "does not permit a notice of claim requirement for [NYSHRL]." (Dkt. 55-17 at 20). Section 50-e may not require a notice of claim for NYSHRL claims, but § 52 does. Plaintiff fails to read the sentence after the one she cites, which states that § 52 "is much broader in scope and it allows for a notice of claim requirement in more types of claims than [§ 50-e]," including those under the NYSHRL. *See Lee*, 603 F. Supp. 2d at 445. Section 52 did not apply in

*Lee* because the suit was against a municipality, and not a county.[6] *See id.* Here, the suit *is* against a county. Section 52, and its broader scope, applies.

Plaintiff also cites *Lewinter v. N.Y. City Dep't of Educ.*, No. 09 Civ. 0227(PGG), 2010 WL 2746334, at *7 (S.D.N.Y. July 9, 2010), for the proposition that § 52 does not apply to claims against county employees. (Dkt. 55-17 at 21). *Lewinter* says nothing of the sort. In *Lewinter*, the Southern District refused to require notice under N.Y. Education Law for a NYSHRL claim against a school principal because the defendant principal was not an "officer" under the terms of the N.Y. Education Law. *Lewinter*, 2010 WL 2746334, at *7. Unlike the Education Law provision at issue in *Lewinter*, § 52 notice is not limited to torts alleged against "officers," but it encompasses employees as well. *See* N.Y. County Law § 52(1). Further, as noted above, § 52's notice requirement applies to claims against county employees if the county is required to indemnify the county employee.

Nonetheless, in contrast with the notice requirement for Schrom, no such notice was required to sue Moss. As the New York Court of Appeals recently held, a county is not required under the laws of New York state or its constitution to indemnify its sheriff. *See Villar*, 28 N.Y.3d at 79. As such, no notice of claim is required. *Id.* at 80. The existence of any contractual agreement to indemnify is immaterial to whether notice is

---

[6] Plaintiff cites another case to support the proposition that § 50-e does not extend to NYSHRL claims, but it, similarly, did not involve claims against a county. (*See* Dkt. 55-17 at 20 (citing *Lane-Weber v. Plainedge Union Free Sch. Dist.*, 624 N.Y.S.2d 185 (2d Dep't 1995) (involving a suit against a school district, and applying N.Y. Education Law and § 50-e, not § 52))).

required. Because no notice was required, Defendants' lack of notice argument fails as to Moss.

### B. Plaintiff's NYSHRL Discrimination and Retaliation Claims against Moss Fail for the Same Reason her Title VII Claim Fails

Defendants argue that even if no notice was required, Plaintiff's discrimination and retaliation claims under the NYSHRL fail because she cannot establish a *prima facie* case. (Dkt. 50-19 at 17, 23). The Court agrees. "[C]laims brought under [the NYSHRL] are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997). "[Plaintiff's] inability to establish a *prima facie* case under Title VII is equally fatal to [her] claims under state law." *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 120 (W.D.N.Y. 2002), *aff'd* 99 F. App'x 350 (2d Cir. 2004).

### C. Plaintiff's State Constitutional Claims Against Moss also Fail

Defendants further argue that even if notice was required, Plaintiff has provided no evidence in support of her claims under the New York Constitution. (Dkt. 50-19 at 25).

#### 1. NYS Const. Art. I § 11

The New York Constitution, Art. I § 11 provides:

> No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

N.Y. Const. art. I, § 11. A claim under the state equal protection claim is analyzed under the same standard as the federal equal protection claim under § 1983. *Hayut*, 652 F.3d at

754 (citing *Brown v. State*, 89 N.Y.2d 172, 190 (1996)). Because summary judgment is appropriate on Plaintiff's federal equal protection claim, it is similarly appropriate on the state equal protection claim. *See, e.g., id.* at 755 ("[B]ecause [the plaintiff] relies on identical facts to support both claims, the state equal protection action suffers the same fate as the section 1983 claim against the individual defendants. Having found that summary judgment was properly granted on the section 1983 claim against those defendants, we also conclude that the district court correctly granted summary judgment in the state constitutional tort action.").

### 2.   NYS Const. Art. I § 6

The New York Constitution also provides that "[n]o person shall be deprived of life, liberty or property without due process of law." N.Y. Const. art. I, § 6. "[D]ue process claims under New York's Constitution, like those raised under the United States Constitution, require the balancing of factors—'an evaluation of the interests of the parties to the dispute, the adequacy of the contested procedures to protect those interests and the government's stake in the outcome.'" *People v. Scalza*, 76 N.Y.2d 604, 610 (1990).

Plaintiff fails to respond to Defendants' argument that she has not provided any evidence to support a claim under the state constitution's due process clause. (*See* Dkt. 55-17 at 25). Indeed, Plaintiff offers no argument as to her claims under the state constitution distinct from those under the federal constitution. Plaintiff does not suggest that her due process rights under the state constitution are any broader than those under

the federal constitution.[7] (*See id.*). Because Plaintiff's state constitution procedural due process claim rests on the same grounds as her federal one, Plaintiff's § 6 claim must be dismissed, as her federal one has been. *See, e.g., Spillman v. City of Yonkers*, No. 07 Civ. 2164(DAB), 2010 WL 2034538, at *4 (S.D.N.Y. May 20, 2010) (granting summary judgment on the plaintiff's § 6 due process claim because the plaintiff had not established a federal due process right); *Wantanabe Realty Corp. v. City of N.Y.*, 315 F. Supp. 2d 375, 401 (S.D.N.Y. 2003) ("There is no suggestion that these state constitutional provisions are any more expansive, at least in any context relevant to this case, than their federal counterparts. Accordingly, . . . [the plaintiff's] procedural due process claims are dismissed in their entirety. . . .").

### 3.     NYS Const. Art. I § 8

Finally, to the extent that Plaintiff raises a retaliation claim under the New York Constitution, Article I, § 8, the claim must also be dismissed to the extent that Plaintiff's First Amendment retaliation claim was dismissed.

"[I]t is a common view among District Courts in this Circuit that there is no right of action under the New York State Constitution for claims that can be brought under § 1983." *Dava v. City of N.Y.*, 1:15-cv-08575 (ALC), 2016 WL 4532203, at *10 (S.D.N.Y. Aug. 29, 2016) (quotation marks omitted) (citing *Gounden v. City of N.Y.*, No.

---

[7]     The Court finds no support for such a suggestion beyond that the state constitution does not require state action, as the federal constitution does. *See Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152, 159 (1978) ("[T]he absence of any express State action language [in § 6] simply provides a basis to apply a more flexible State involvement requirement than is currently being imposed by the Supreme Court with respect to the Federal provision."). However, such a distinction is irrelevant in this case, where Defendants are state actors.

14 Civ. 7411, 2015 WL 5793625, at *5 n.3 (E.D.N.Y. Oct. 2, 2015); *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439 (S.D.N.Y. 1999)). "'New York courts will only imply a private right of action under the state constitution where no alternative remedy is available to the plaintiff.'" *Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 368 (S.D.N.Y. 2013) (quoting *Felmine v. City of N.Y.*, No. 09-CV-3768 (CBA)(JO), 2012 WL 1999863, at *6 (E.D.N.Y. June 4, 2012)).

Plaintiff asserts a First Amendment retaliation claim under § 1983. Part of that claim remains. Thus, because an alternative, non-state-constitution remedy is available to Plaintiff, and because she has not elucidated any different injuries under the state constitution, the Court grants summary judgment on Plaintiff's § 8 claim. *See, e.g.*, *Davis*, 959 F. Supp. 2d at 368 ("In order to survive summary judgment, [the] plaintiffs must at least show that they have suffered constitutional injuries under [the state constitution] that are not recognized under the [federal constitution].").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 50) is granted in part and denied in part. The following claims remain: (1) Plaintiff's FMLA retaliation claim against the County to the extent that it relies on the elimination of Plaintiff's regularly scheduled Sunday shift, the County's opposition to Plaintiff's application for unemployment benefits, and the refusal to reinstate Plaintiff's regularly scheduled hours after her FMLA leave ended; and (2) Plaintiff's First Amendment retaliation claim against all Defendants based on the cessation of offering her call-in shifts.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 5, 2017
        Rochester, New York